IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES ex rel.<br>China Pacificarbide, Inc.<br><br>    Relator-Plaintiff<br><br>v.<br><br>King Kong Tools, LLC;<br>KingKong-Tools GmbH & Co KG<br><br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**1:19-CV-5405**

CASE NO.:

SEALED UNDER 31 U.S.C. § 3730(b)

COMPLAINT AND JURY DEMAND

DO NOT PLACE IN PRESS BOXES

DO NOT POST ONLINE

DO NOT MAKE PUBLICLY
AVAILABLE

## COMPLAINT

The United States of America ex rel. China Pacificarbide, Inc. ("Relator"), files this Complaint against Defendant King Kong Tools, LLC ("KKT USA") and KingKong-Tools GmbH & Co KG ("KKT Germany"), (collectively "Defendants" or "KKT"). In support thereof, Relator respectfully show the Court as follows:

### I. THE PARTIES

1.  Relator is a California Corporation having its principal place of business in Chino, California.

2.  Defendant KingKong-Tools GmbH & Co KG ("KKT Germany") is a company with its principal place of business in Aichhalden, Germany.

3.  Defendant King Kong Tools, LLC ("KKT USA") is a limited liability company with its principal place of business in Buford, Georgia.

1

4. Upon information and belief, KKT USA is the U.S. subsidiary of KKT Germany.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 (Federal question), 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

6. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found, reside, and/or transact business in this District. Title 31, United States Code, Section 3732(a) further provides for nationwide service of process.

7. Upon information and belief, this Complaint is not based on the facts underlying any pending related *qui tam* action, within the meaning of the False Claims Act's first-to-file rule, 31 U.S.C. § 3730(b)(5).

8. This action is not precluded by any provisions of the False Claims Act's jurisdiction bar, 31 U.S.C. § 3730(e) *et. seq.*

   a. Upon information and belief, this Complaint is not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party. 31 U.S.C. §3730(e)(3).

   b. Upon further information and belief, there has been no "public disclosure" of key facts alleged herein regarding Relator's discovery and investigation of the fraud. Moreover, Relator is an "original source" of information as defined by 31 U.S.C. §3730(e)(4)(B) of the False Claims Act.

2

9. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a), because Defendants can be found in and transact business within this District.

### III. THE FEDERAL FALSE CLAIMS ACT

10. The False Claims Act (FCA), which was originally enacted in 1863, was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153 to enhance the Government's ability to recover losses as a result of fraud. Among other things, the amendments created incentives for individuals with knowledge of fraud on the United States to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. According to the Supreme Court, the FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. The FCA, as amended, includes a reverse false claims provision that imposes liability on a party that, by false statement, seeks to conceal, avoid, or decrease a precise, preexisting obligation to pay the United States. 31 U.S.C. § 3729(a)(1)(G).

11. The FCA provides that any person who knowingly makes, uses, or causes to be made or used false records and statements to decrease its obligations to the Government is liable for a civil penalty ranging from $5,500 up to $11,000 (as of the filing date of this Complaint) for each such violation, plus three times the amount of the damages sustained by the Federal Government.

### IV. THE APPLICATION OF THE FCA TO THE TARIFF ACT OF 1930 AND THE TRADE ACT OF 1974

12. All goods imported into the United States are taxed according to the Harmonized Tariff Schedule of the United States ("HTS") (codified at 19 U.S.C. § 1202).

3

13. Under customs regulations, importers have an existing, non-contingent, and nondiscretionary liability for customs duties. See, e.g., 19 C.F.R. §§141.4, 159.2 (demanding entry and liquidation of imported merchandise); 19 U.S.C. § 1503 (assessment of duties on imports is generally based on the appraised value of the imported goods as determined on liquidation). Such liability arises immediately and automatically upon the importation of goods into the United States. 19 C.F.R. § 141.1 (b)(1). Generally, the importer is required to deposit estimated duties with CBP at the time of entry. 19 U.S.C. § 1505; 19 C.F.R. § 141.101. The amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate.

14. The United States Customs and Border Protection ("CBP"), a division of the Department of Homeland Security, is responsible for assessing and collecting duties.

15. The documents required to be filed with Customs & Border Protection include, among other things, (i) an entry summary (Form 7501) that declares the country of origin, the value of the merchandise and the applicable duty rate; and (ii) a commercial invoice that provides verification of the country of origin. *See, e.g.,* 19 C.F.R. §§ 141.0a, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

16. Each Form 7501, therefore, contains an explicit declaration of compliance that each importer of record or the importer's authorized agent must sign, which states, in pertinent part, that the signatory declares under oath that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all I will immediately furnish to the appropriate Customs & Border Protection

officer any information showing a different statement of facts." See 19 U.S.C. § 1485(a)(3) and CBP Form 7501 at Box 36.

17. CBP relies on importers to supply accurate information about imported merchandise, including the applicable HTS classification and country of origin.

18. Accordingly, misclassification and misdescription of goods made to avoid or decrease the obligation to pay the correct duties are actionable under the False Claims Act's reverse false claims provision. 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)).

19. Further, the Marking Statute, 19 U.S.C. §1304, requires that "every article of foreign origin (or its container ...) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." If at the time of importation, any article or its container is not marked with the correct country of origin, there shall be a 10% ad valorem duty ("marking duty") on the article, which shall be deemed to have accrued at the time of the importation, and shall not be remitted wholly or in part, and the payment shall not be avoidable for any cause. See 19 U.S.C. § 1304(f).

20. Accordingly, wrong country of origin marking and intentional avoidance to pay the marking duty are actionable under the False Claims Act's reverse false claims provision. 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)).

21. Section 301 of the Trade Act of 1974 authorizes the United States Trade Representative ("USTR") to investigate and determine whether a foreign government's acts, policies, and practices violates, or are inconsistent with the provisions of or otherwise denies benefits to the United States under any trade agreement or is unjustifiable and burdens or

5

restricts U.S. commerce. 19 U.S.C. 2411(a). Upon a determination of actionability, section 301(b) provides for the Trade Representative to take all appropriate and feasible action authorized under section 301(c) of the Trade Act of 1974 (19 U.S.C. 2411(c)), subject to the specific direction, if any, of the President regarding such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under section 301(b), to obtain the elimination of that act, policy, or practice.

22. In 2017, the USTR initiated an investigation into the government of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation in 2017.

23. On April 6, 2018, the USTR announced his determination that the acts, policies, and practices were unreasonable or discriminatory and burden or restrict U.S. commerce, and were thus actionable under section 301(b) of the Trade Act of 1974 (19 U.S.C. 2411(b)).

24. On June 20, 2018, the USTR issued a Notice of Action, imposing additional 25% *ad valorem* duties on products of Chinese origin whose tariff codes are on the Annex A to the Notice. These products are referred to as List 1 products. They will be subject to the 25% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on July 6, 2018.

25. On August 16, 2018, the USTR issued a Notice of Action, imposing additional 25% *ad valorem* duties on products of Chinese origin whose tariff codes are on the Annex A to the Notice. These products are referred to as List 2 products. They will be subject to the 25% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 23, 2018.

26. On September 21, 2018, the USTR issued a Notice of Action, imposing additional 10% *ad valorem* duties on products of Chinese origin whose tariff codes are on the Annex A to the Notice. These products are referred to as List 3 products. They will be subject to the 10% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on September 24, 2019.

27. On June 10, 2019, the USTR issued a Notice of Action, increasing the *ad valorem* duties on List 3 products from 10% to 25% if (1) exported to the United States after May 10, 2019 or (2) entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on June 15, 2019.

28. These Section 301 Actions amend the HTSUS by creating HTSUS headings of 9903.88.01, 9903.88.02, 9903.88.03, etc. in the HTSUS. Therefore, a product from China may be subject to a regular duty and the additional Section 301 tariff.

29. Section 301 tariff is a customs duty. Therefore, the importer is required to deposit Section 301 tariffs equal to the value of the imported Chinese origin merchandise multiplied by the applicable tariff rate.

30. Accordingly, false statements or records made to avoid or decrease this obligation to pay are actionable under the False Claims Act's reverse false claims provision. 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)).

## V. INTRODUCTION

31. Tungsten Carbide is a chemical compound containing equal parts of tungsten and carbon atoms. In its most basic form, tungsten carbide is a fine gray powder, but it can be pressed and formed into shapes through a sintering process.

7

32. Tungsten carbide is extremely hard, ranking about 9 on Mohs scale, and with a Vickers number of around 2600. It has a Young's modulus of approximately 530–700 GPa, a bulk modulus of 630–655 GPa, and a shear modulus of 274 GPa. It has an ultimate tensile strength of 344 MPa, an ultimate compression strength of about 2.7 GPa and a Poisson's ratio of 0.31.

33. Similar to Tungsten Carbide, Titanium Carbide, Tantalum Carbide, and Niobium Carbide are also very hard materials.

34. Because of their hardness and capability to withstand high temperature, carbides are extensively used in industrial machinery, cutting tools, and abrasives.

35. Carbides tools are not made of only carbides because of the high cost of carbides. Only the parts that touch and work on the materials to be worked are carbides. The carbide parts (in forms of tips or inserts) are brazed to steel bodies that would be installed on the machinery.

## VI. FACTS

36. Relator is in the business of manufacturing, importing, and distributing carbide tools.

37. Relator's manufacturing takes place in China because China has the world's largest production of tungsten, tantalum, titanium, and niobium mines.

38. One of Relator's factories in China is Zhejiang Pacific Machinery Co., Ltd. ("Zhejiang Pacific") located in Fengqing Street, Deqing, Huzhou, Zhejiang, China, 313200.

39. KKT Germany is in the business of manufacturing, importing and, distributing carbide tools in U.S. and Europe.

40. KKT USA is in the business of importing and distributing carbide tools in the U.S.

41. KKT's catalog is attached as **Exhibit 1**. It represents the carbide tools imported by KKT USA into the U.S.

## A. False Country of Origin, Evasion of Marking Duties, Transshipment, and Evasion of Section 301 Tariffs

42. KKT states on its website that all of its carbide tools are made in Germany. See **Exhibit 2**. Implicitly, this statement means that KKT USA only imports carbide tools of German origin.

43. This is completely false. Attached in **Exhibit 3** please find Panjiva import data showing from 2014 to 2019, KKT USA has been importing carbide tools from China.

44. Relator also knows for a fact that KKT are making carbide tools in China. In 2019, Relator visited Zhejiang Pacific twice and each time found that the factory was making carbide tips and brazing the carbide tips on steel bodies that were impressed with King Kong logos. See **Exhibit 4**. The factory packed the complete carbide tools into cartons bearing King Kong logos. See **Exhibit 5**. The label on the carton states "Highest Quality from Germany" and lists both KKT Germany and KKT USA's phone number - +49-7422-270099-100 and +1-678-765-7930 respectively. See **Exhibit 6**. Relator also observed that the steel bodies were machined in China, for example, holes were drilled on the steel bodies or surfaces were polished perfectly flat to fit to the machinery they are going to work with. That is to say, the carbide tools made by Zhejiang Pacific for KKT in China were final finished products. No further manufacturing was required for KKT to perform before it sells the products to its customers.

45. KKT's manufacturing carbide tools, importing them to the U.S. and claiming them of German origin was previously revealed in a federal patent infringement lawsuit, styled as

9

*Fecon, Inc. v. King Kong Tools, LLC and Kingkong Tools Gmbh & Co. KG* with case number 1:16-cv-1137. The complaint is attached as **Exhibit 7**.

46. This patent infringement lawsuit is not a "public disclosure" bar to this instant *qui tam* action because it did not relate to the avoidance of paying Section 301 tariffs or the avoidance of paying regular duties by misclassification.

47. Betek GmbH is a competitor of the Relator and KKT. It is located in the same city as KKT in Germany. One of its U.S. salesman stated that KKT is not manufacturing at any German facility and expressed the concern that KKT was causing sales problems to Betek as well by falsely claiming German origin.

48. The Panjiva import data shows that KKT USA has been importing carbide tools of Chinese and German origin at least during 2013-2019.

49. Based on the above information, KKT USA has claimed a false country of origin during the last six years.

50. Because KKT claims that all of its carbide tools are made in Germany, it must have marked all of its products are "Product of Germany" or "Made in Germany" as required by the marking statute, 19 U.S.C. § 1304.

51. Declaration of the wrong country of origin on the 7512 is a violation of the Tariff Act itself. *See* 19 U.S.C. §1304 ("… every article of foreign origin (or its container …) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.")

52. Further, if at the time of importation, any article or its container is not marked with the correct country of origin, there shall be a 10% ad valorem duty on the article, which shall be deemed to have accrued at the time of the importation, and shall not be remitted wholly or in part, and the payment shall not be avoidable for any cause. See 19 U.S.C. § 1304(f).

53. Relator estimates that the marking duty of 10% of the entered value for the past six years exceeds $1,175,000.00.

54. Before June 2018, the duty rates for  carbide tools are the same for products from China and from Germany.

55. KKT USA imported carbide tools and classified them under HTSUS subheadings of 8479.89.xxxx, 8430.39.xxxx, 8413.91.xxxx, 8430.41.xxxx, 8474.20.xxxx, 8431.43.xxxx, 8431.49.xxxx, 8431.49.9085, 7318.15.20xx, 7315.22.00xx, etc.[1], according to the Panjiva report. *See* **Exhibit 3**.

56. On June 20, 2018, the USTR issued a Notice of Action, imposing additional 25% *ad valorem* duties on List 1 products of Chinese origin. 8430.39, 8413.91, 8430.41, 8474.20, 8431.43 and 8431.49 are on the list. These products will be subject to the 25% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on July 6, 2018.

57. On August 16, 2018, the USTR issued a Notice of Action, imposing additional 25% *ad valorem* duties on List 2 products of Chinese origin. These products will be subject to the 25% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 23, 2018.

---

[1] Panjiva report does not provide the full 10 digit of the HTSUS code.

58. On September 21, 2018, the USTR issued a Notice of Action, imposing additional 10% *ad valorem* duties on List 3 products of Chinese origin. These products will be subject to the 10% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on September 24, 2019.

59. On June 10, 2019, the USTR issued a Notice of Action, increasing the *ad valorem* duties on List 3 products of Chinese origin from 10% to 25% if (1) exported to the United State after May 10, 2019 or (2) entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on June 15, 2019.

60. From July 2018, KKT USA had only four imports from China: (1) grinder tips under 8413.91 (List 1) on July 17, 2018; (2) tools for tunneling and levelling machinery with carbide under 8430.39 (List 1) on August 14, 2018; (3) tools for tunneling and levelling machinery with carbide under 8479.89 (List 3) on September 8, 2018; and (4) tools for tunneling and levelling machinery with carbide under 8479.89 (List 3) on September 21, 2018.

61. After September 21, 2018, KKT USA stopped all imports from China. Before that it had about one shipment per month from China. Each shipment is estimated to have been $125,000.00 in value. The applicable Section 301 tariff would be $31,250 per shipment.

62. The Relator continues to import from China and legally paid the additional 10-25% tariffs as required by law. Because of the tariff, Relator has had to increase its sale price.

63. On the other hand, KKT USA avoids paying the tariff by "importing" only from Germany. Therefore, KKT USA's price remains at its pre-Section 301 tariff level.

64. On information and belief, KKT USA avoids paying the tariff by transshipping through Germany and claiming German origin of Chinese goods.

65. As stated above, KKT Germany does not manufacture in Germany; KKT was caught manufacturing carbide tools in China in August 2019; KKT is habitual in wrongfully claiming German origin, it is highly possible that KKT transshipped all its imports and lied about the origin, before and after the Section 301 tariffs were announced.

66. Further, according to Panjiva data, during 2016 to 2018, KKT's Chinese imports are at least twice the volume of its German imports (which Relator believes are also transshipped). It is not realistic to believe that it could have suddenly stopped imports from China and substituted the quantity of Chinese goods with German goods.

67. A Google map search shows that KKT Germany is only a small building. See **Exhibit 9**. It is not possible to house the manufacturing facilities capable of producing the quantity that KKT USA was purportedly imported from Germany.

68. On information or belief, KKT USA's salesman told one of its customers the reason that KKT was able to continue to sell its carbide tools at the prices before the Section 301 tariffs was that KKT Germany imported Chinese carbide tips and brazed the carbide tips to steel bodies in Germany.

69. However, this contravenes the facts the Relator recorded in Zhejiang Pacific in August and September 2019, where the factory was observed making complete carbide tools for KKT.

70. If KKT Germany assembled Chinese carbide tips and steel bodies (of any origin) in Germany, why did Zhejiang Pacific use packaging boxes stating "Highest Quality from Germany?"

71. The complete carbide tools made in Zhejiang Pacific must be destined for U.S. market because the labels list country of origin in English and KKT USA's phone number.

72. Assembly of Chinese carbide tips to German steel bodies in Germany is also not economically possible. A carbide tip is usually 60-70% value of a complete carbide tool. The labor cost in Germany is 5 times the labor cost in China. Also, Carbide tips are subject to 35% antidumping duties in EU. See **Exhibit 8**. A German carbide tool will be at least double the cost of a Chinese carbide tool. However, KKT USA sells its goods for 25% lower than the Relator's price of Chinese carbide tools, reflecting the Chinese origin and the 25% duty evasion.

73. The only possible explanation for the above is that KKT transships complete carbide tools of Chinese origin and enters them as German originating goods.

74. The Relator estimates that the Section 301 tariffs that have been evaded by KKT is $625,000.

## B. Misclassification and Underpayment of Regular Duties

75. KKT USA imported carbide tools and classified them under HTSUS subheadings of 8479.89.xxxx, 8430.39.xxxx, 8413.91.xxxx, 8430.41.xxxx, 8474.20.xxxx, 8431.43.xxxx, 8431.49.xxxx, 8431.49.9085, 7318.15.20xx, 7315.22.00xx, etc.[2], according to the Panjiva report. *See* **Exhibit 3**.

76. Relator believes that KKT USA must have misclassified and misdescribed the vast majority, if not all, of its imported merchandise.

77. For example, KKT USA imported "TOOLS FOR TUNNELING AND LEVELLING MACHINERY WITH CARBIDE" under two different HTSUS codes – 8479.89.xxxx and 8430.39.xxxx. Which one is the correct HTSUS code? Further, subheading 8479.89 provides for COMPLETE "machines and mechanical appliances having individual

---

[2] Panjiva report does not provide the full 10 digit of the HTSUS code.

functions, not specified or included elsewhere in [Chapter 84]." Subheading 8430.30 provides for "Other moving, grading, leveling, scraping, excavating, tamping, compacting, extracting or boring machinery, for earth, minerals or ores; pile-drivers and pile-extractors; snowplows and snowblowers: Coal or rock cutters and tunneling machinery: Other." These provisions are for COMPLETE machinery, not the interchangeable/wearable parts.

78. As another example, KKT USA imported "GRINDER TIPS - ROTARY DRILLING RIG PARTS" under three different HTS subheadings - 8413.91, 8430.41 and 8774.20. Which is correct? Subheading 8413.91 provides for "Pumps for liquids, whether or not fitted with a measuring device; liquid elevators; part thereof: parts." From the description, the merchandise is not a part of a pump or liquid elevator, but a part of rotary drilling rig. Rotary drilling rig is classified under HTSUS subheading of 8430.49. Rotary drilling rig parts should be classified in subheading 8431.43.4000.

79. As yet another example, KKT USA imported "STEEL PARTS FOR TUNNELING AND LEVELLING" under three different HTSUS subheadings - 8431.43, 8430.39 and 8431.49.9095.  Only one can be correct: which is it?

80. Moreover, from KKT USA's website and its catalog it is obvious that KKT USA imports not just steel parts or tools for tunneling or leveling machine or rotary drilling rig parts. It imports carbide tipped replacement tools for forestry mulchers, replacement blade for wood chippers, replacement tooth for shredders, replacement tooth for grinders, and so on and so forth. KKT USA has intentionally incorrectly described and misclassified the merchandise it imported.

81. All the above tariff codes KKT USA used provides for duty-free entry: a 0% duty rate.

82. Relator imports similar items as KKT USA and is paying 0 – 5% regular duties, depending on the type of products. Relator's average duty payment is 2.5% of the entered value.

83. Because of KKT USA's misclassification and misdescription of imported merchandise, Relator can only estimate the duty loss caused by KKT USA's misclassification and misdescription schemes. It estimates by multiplying the estimated total value of shipments in the previous 5 years and 3 months (because Panjiva can only provide information back to August 2014, we can only estimate based on the 94 shipments and $125,000 each shipment) by 2.5%. The amount of duty underpayment in the past 5 years is estimated to be $293,750.

## COUNT I
## Violation of the False Claims Act – 31 U.S.C. §3729(a)(1)(G)

84. Relator incorporates and realleges the relevant factual allegations above as if set forth fully herein.

85. As set forth above, Defendants knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States.

86. The Relator estimates that the Section 301 tariffs that have been evaded by KKT is $625,000.

87. The Relator estimates that the regular duties that have been evaded by KKT is $293,750.

88. Additionally, marking duty of 10% of the entered value is estimated to exceed $1,175,000.00.

89. The Government incurred losses relating to customs duties underpaid by Defendants because of their wrongful and fraudulent conduct.

90. By virtue of the false records or statements made by Defendants, the Government suffered damages.

91. These false claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

92. The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

93. The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims, i.e. each line item on every entry misdeclared.

94. Relators are entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(l).

## COUNT II
## Conspiracy to Violate the False Claims Act – 31 U.S.C. § 3729(a)(1)(C)

95. Relator incorporates and realleges the relevant factual allegations above as if set forth fully herein.

96. Relators seek relief under Section 3729(a)(l)(C) of the False Claims Act.

97. As set forth above, Defendants KKT Germany and KKT USA conspired to make, use, or cause to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States.

98. The Government incurred losses relating to customs duties underpaid by Defendants because of their conspiracy to commit wrongful and fraudulent conduct.

99. As set forth above, because Defendants Germany and KKT USA knowingly conspired to make, use, or cause to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States, the Government incurred losses relating to customs duties underpaid by Defendant KKT USA because of the wrongful and fraudulent conduct of Defendants KKT Germany and KKT USA.

100. The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

101. The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

102. Relators are entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(l).

### COUNT III
### False Advertising in Violation of the Lanham Act

103. Relator incorporates and realleges the relevant factual allegations above as if set forth fully herein.

104. KKT Germany and KKT USA import and sell carbide tools of Chinese origin while they advertise that all their products are Made in Germany.

105.    This is a false designation of origin within the meaning of Section 43 of the
        Lanham Act. See 15 U.S.C. §1125.

106.    As a result of Defendants' false advertising, Relator has been competitively
        disadvantaged. Relator has suffered and continues to suffer actual damages. These
        damages include, but are not limited to, the disgorgement of any profits that these
        Defendants unfairly realized, retained, or gained through its false advertising; the losses
        experienced by the Relator, and Relator's costs incurred in prosecuting this matter.

107.    The Defendants are making these false and/or misleading representations of fact
        with full knowledge that the representations are false and/or misleading, or in intentional
        disregard of their falsity and misleading nature. For this reason, Relator is entitled to an
        award of enhanced damages under Section 35(a) of the Lanham Act (15 U.S.C.
        §1117(a)). Moreover, this is an exceptional case for which the Court should award
        University Loft its reasonable attorneys' fees.

108.    Additionally, the Defendants' violations of the Lanham Act have caused and will
        continue to cause irreparable harm to the Relator for which it has no adequate remedy at
        law. In particular, the Defendants' past and continuing false and/or misleading
        representations of fact described above are causing irreparable harm to the Relator. The
        Relator will continue to suffer irreparable injury to its goodwill, rights, and business unless
        the Defendants are enjoined from continuing their false advertising.

### COUNT IV
### Violation of Georgia Deceptive Trade Practices Act, § 10-1-372

109.    Relator incorporates and realleges the relevant factual allegations above as if set
        forth fully herein.

110.    By virtue of the illegal acts described above including their violations of the False

Claims Act and their false advertising, these Defendants have engaged in deceptive trade

practices under Georgia law because their wrongful acts are contrary to honest practice in

commercial matters and have interfered with the Relator's ability to conduct its business.

111.    Additionally, Defendants' acts of deceptive trade practices described above,

including the false advertising, have caused and will continue to cause irreparable harm

to the Relator for which it has no adequate remedy at law. The Relator will continue to

suffer irreparable injury to its goodwill, rights and businesses unless Defendants and any

others in active concert with them are enjoined from continuing their acts of unfair

competition.

## PRAYER FOR RELIEF

Relators pray that this Court enter an order granting the following judgment and relief:

(a) Ordering the Defendants to pay the United States Government three times its actual

damages resulting from the Defendants' violations of the False Claims Act;

(b) Ordering Defendants to pay the United States Government a civil penalty for each false

claim as set forth in the False Claims Act;

(c) Awarding Relators an amount this Court decides is reasonable for collecting the civil

penalty and monetary damages by pursuing this matter, which award, by statute shall not be

less than 15% nor more than 25% of the proceeds of this action or the settlement of any such

claim, if the Government intervenes in the action and not less than 25% nor more than 30%,

if the Government declines to intervene in the action;

(e) Awarding the Relator the actual and exemplary damages on its Lanham Act and

state law claims;

(f) Enjoining permanently Defendants from its false advertising and acts of unfair competition;

(g) Awarding costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), the Lanham Act and Georgia Uniform Deceptive Trade Practices Act; and

(e) Granting such other relief as the Court may deem just and proper.

**Relator demands a trial by jury.**

Respectfully submitted,

/s/ Michael J. Thomas
Michael J. Thomas
FL Bar No. 897760
mike@penningtonlaw.com
/s/ Shanshan Liang
Shanshan Liang
FL Bar No. 112991
sliang@penningtonlaw.com
/s/ Neil B. Mooney
Neil B. Mooney
FL Bar No. 169463
nmooney@penningtonlaw.com
**Pennington P.A.**
215 S. Monroe Street, Suite 200
Tallahassee, FL 32301
Office - (850) 222-3533
Fax - (850) 222-2126

*Counsel for China Pacificarbide, Inc.*

DISCLOSURE STATEMENT


UNITED STATES ex rel.
China Pacificarbide, Inc.

Relator-Plaintiff

v.

King Kong Tools, LLC;
KingKong-Tools GmbH & Co KG

Defendants

Provided to the Attorney General of the United States and the United States Attorney for the Northern District of Georgia


Prepared by:
Shanshan (Shannon) Liang
Neil B. Mooney,
And Mike J. Thomas
of Pennington P.A.
Tallahassee, Florida

# I. INTRODUCTION

The United States is sustaining hundreds of thousands or millions of dollars in damages from KingKong-Tools GmbH & Co KG's ("KKT Germany") and King Kong Tools, LLC's ("KKT USA") long-running and illegal scheme to avoid marking duties, regular duties, and Section 301 tariffs on imports of carbide tools from China. As described below, relator China Pacificarbide, Inc. believes that from at least 2014 and continuing through the present, KKT Germany and KKT USA (collectively "Defendants" or "KKT") have been violating the reverse false claims provision of the False Claims Act by knowingly evading or conspiring to evade their obligations to pay applicable import duties on carbide tools, by misclassification and transshipment. Relator has been able to determine these violations are occurring in part through its own investigation of Defendants' Chinese suppliers and through examination of relevant trade database. Relator's investigation makes clear that Defendants have been misclassifying the carbide tools to underpay the regular import duties and transshipping the Chinese made carbide tools through Germany to avoid paying the Section 301 tariffs, and thereby also owe marking duty.

As required by 31 U.S.C. § 3730(b)(2), qui tam plaintiff China Pacificarbide, Inc. hereby submits this Disclosure Statement containing substantially all the evidence and information it possesses relating to Defendants' illegal scheme. Based on information presently known by the Relator, the damages and penalties at issue are over $3 Million. Relator respectfully urges the Government to act quickly to investigate this matter, because it believes several shipments of carbide tools being imported by Defendants are currently in transit and will soon arrive at ports in the United States. If these shipments are inspected by Customs, Relator believes the Government will be able to quickly establish that Defendants have been defrauding the Government, by either misclassifying the goods or by falsely designating the origin of goods.

# II. THE PARTIES

## A. Carbide Tools

Tungsten Carbide is a chemical compound containing equal parts of tungsten and carbon atoms. In its most basic form, tungsten carbide is a fine gray powder, but it can be pressed and formed into shapes through sintering process. Tungsten carbide is extremely hard, ranking about 9 on Mohs scale, and with a Vickers number of around 2600. It has a Young's modulus of approximately 530–700 GPa, a bulk modulus of 630–655 GPa, and a shear modulus of 274 GPa. It has an ultimate tensile strength of 344 MPa, an ultimate compression strength of about 2.7 GPa and a Poisson's ratio of 0.31. Similar to Tungsten Carbide, Titanium Carbide, Tantalum Carbide, and Niobium Carbide are also very hard materials. Because of their hardness and capability to withstand high temperature, carbides are extensively used in industrial machinery, cutting tools, and abrasives.

Carbides tools are not made entirely of carbides because of the high cost of carbides. Only the parts that touch and work on the materials to be worked are carbides. The carbide parts (in forms of tips or inserts) are brazed to steel bodies that would be installed on the machinery.

B. *Qui Tam* Plaintiff

Relator is a California Corporation having its principal place of business in Chino, California. Relator is in the business of manufacturing, importing, and distributing carbide tools. Relator's manufacturing takes place in China because China has the rich tungsten, tantalum, titanium, niobium mines and has the world's largest production of these metals. One of Relator's factory in China is Zhejiang Pacific Machinery Co., Ltd. ("Zhejiang Pacific") located in Fengqing Street, Deqing, Huzhou, Zhejiang, China, 313200.

C. Defendants

KKT Germany is a company with its principal place of business in Aichhalden, Germany. KKT USA") is a limited liability company with its principal place of business in Buford, Georgia. Relator believes that KKT USA is the U.S. subsidiary of KKT Germany. KKT Germany is in the business of manufacturing, importing and distributing carbide tools in U.S. and Europe. KKT USA is in the business of importing and distributing carbide tools in the U.S. KKT's catalog is attached as **Exhibit 1**. It represents the carbide tools imported by KKT USA into the U.S.

KKT states on its website that all of its carbide tools are made in Germany. See **Exhibit 2**. Implicitly, this statement means that KKT USA only imports carbide tools of German origin. This is completely false. Attached in **Exhibit 3** please find Panjiva import data showing from 2014 to 2019, KKT USA has been importing carbide tools from China.

## III. BACKGROUND

A. The Law

*1. The Federal False Claims Act*

The False Claims Act (FCA), which was originally enacted in 1863, was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153 to enhance the Government's ability to recover losses as a result of fraud. Among other things, the amendments created incentives for individuals with knowledge of fraud on the United States to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. According to the Supreme Court, the FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. The FCA, as amended, includes a reverse false claims provision that imposes liability on a party that, by false statement, seeks to conceal, avoid, or decrease a precise, preexisting obligation to pay the United States. 31 U.S.C. § 3729(a)(l)(G).

The FCA provides that any person who knowingly makes, uses, or causes to be made or used false records and statements to decrease its obligations to the Government is liable for a civil penalty ranging from $5,500 up to $11,000 (as of the filing date of this Complaint) for each such violation, i.e. for every misdeclared line item on each entry filed with Customs, plus three times the amount of the damages sustained by the Federal Government.

*2. The Application of The FCA To the Tariff Act of 1930 and the Trade Act of 1974*

All goods imported into the United States are taxed according to the Harmonized Tariff Schedule of the United States ("HTS") (codified at 19 U.S.C. § 1202). Under customs regulations, importers have an existing, non-contingent and nondiscretionary liability for customs duties. See, e.g., 19 C.F.R. §§141.4, 159.2 (demanding entry and liquidation of imported merchandise); 19 U.S.C. § 1503 (assessment of duties on imports is generally based on the appraised value of the imported goods as determined on liquidation). Such liability arises immediately and automatically upon the importation of goods into the United States. 19 C.F.R. § 141.1 (b)(1). Generally, the importer is required to deposit estimated duties with CBP at the time of entry. 19 U.S.C. § 1505; 19 C.F.R. § 141.101. The amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate.

The documents required to be filed with Customs & Border Protection include, among other things, (i) an entry summary (Form 7501) that declares the country of origin, the value of the merchandise and the applicable duty rate; and (ii) a commercial invoice that provides verification of the country of origin. See, e.g., 19 C.F.R. §§ 141.0a, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a). Each Form 7501, therefore, contains an explicit declaration of compliance that each importer of record or the importer's authorized agent must sign, which states, in pertinent part, that the signatory declares under oath that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all I will immediately furnish to the appropriate Customs & Border Protection officer any information showing a different statement of facts. See 19 U.S.C. § 1485(a)(3) and CBP Form 7501 at Box 36.

The United States Customs and Border Protection ("CBP"), a division of the Department of Homeland Security, is responsible for assessing and collecting duties. CBP relies on importers to supply accurate information about imported merchandise, including the applicable HTS classification and country of origin.

Accordingly, misclassification and misdescription of goods made to avoid or decrease the obligation to pay the correct duties are actionable under the False Claims Act's reverse false claims provision. 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)).

The Marking Statute in the Tariff Act, 19 U.S.C. §1304, requires that "every article of foreign origin (or its container …) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." If at the time of importation, any article or its container is not marked with the correct country of origin, there shall be a 10% ad valorem duty ("marking duty") on the article, which shall be deemed to have accrued at the time of the importation, and shall not be remitted wholly or in part, and the payment shall not be avoidable for any cause. See 19 U.S.C. § 1304(f).

3

Accordingly, wrong country of origin marking and intentional avoidance to pay the marking duty are actionable under the False Claims Act's reverse false claims provision. 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)).

Section 301 of the Trade Act of 1974 authorizes the United States Trade Representative ("USTR") to investigate and determine whether a foreign government's acts, policies, and practices violates, or is inconsistent with the provisions of or otherwise denies benefits to the United States under any trade agreement or is unjustifiable and burdens or restricts U.S. commerce. 19 U.S.C. 2411(a). Upon a determination of actionability, section 301(b) provides for the Trade Representative to take all appropriate and feasible action authorized under section 301(c) of the Trade Act of 1974 (19 U.S.C. 2411(c)), subject to the specific direction, if any, of the President regarding such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under section 301(b), to obtain the elimination of that act, policy, or practice.

In 2017, the USTR initiated an investigation into the government of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation in 2017. On April 6, 2018, the USTR announced his determination that the acts, policies, and practices were unreasonable or discriminatory and burden or restrict U.S. commerce, and were thus actionable under section 301(b) of the Trade Act of 1974 (19 U.S.C. 2411(b)). On June 20, 2018, the USTR issued a Notice of Action, imposing additional 25% ad valorem duties on products of Chinese origin whose tariff codes are on the Annex A to the Notice. These products are referred to as List 1 products. They will be subject to the 25% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on July 6, 2018. On August 16, 2018, the USTR issued a Notice of Action, imposing additional 25% ad valorem duties on products of Chinese origin whose tariff codes are on the Annex A to the Notice. These products are referred to as List 2 products. They will be subject to the 25% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 23, 2018. On September 21, 2018, the USTR issued a Notice of Action, imposing additional 10% ad valorem duties on products of Chinese origin whose tariff codes are on the Annex A to the Notice. These products are referred to as List 3 products. They will be subject to the 10% tariff if entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on September 24, 2019. On June 10, 2019, the USTR issued a Notice of Action, increasing the ad valorem duties on List 3 products from 10% to 25% if (1) exported to the United State after May 10, 2019 or (2) entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on June 15, 2019.

These Section 301 Actions amends the HTSUS by creating HTSUS headings of 9903.88.01, 9903.88.02, 9903.88.03, etc. in the HTSUS. Therefore, a product from China may be subject to a regular duty and the additional Section 301 tariff. Section 301 tariff is a customs duty. Therefore, the importer is required to deposit Section 301 tariffs equal to the value of the imported Chinese origin merchandise multiplied by the applicable tariff rate.

Accordingly, false statements or records made to avoid or decrease this obligation to pay are actionable under the False Claims Act's reverse false claims provision. 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)).

*1. Relator's Initial Discovery of Defendants' Illegal Scheme*

Before the imposition of Section 301 tariffs on carbide tools, Relator and KKT USA were selling carbide tools at the similar prices because they all sourced from China. Since the imposition of Section 301 tariffs, Relator has duly paid the additional 10-25% tariffs and increased its sale price accordingly. In 2019, Relator lost several large orders from two regular customers to KKT USA. Relator inquired the customers as to why they purchased from KKT USA. The customers told Relator that KKT USA did not increase its pricing so KKT USA was selling about 10-25% cheaper than the Relator. Relator further asked the customers how KKT USA could afford not increasing its prices if it also needed to pay the additional tariff. The customers inquired with KKT USA and was told that since the Section 301 action, KKT USA had stopped importing from China and imported all of its products from Germany.

Relator did not believe this explanation was credible because German-made carbide tools would be much more expensive than Chinese carbide tools. Relator's former customers told Relators that KKT USA explained that KKT Germany still made carbide tips in China but assembled it with German steel bodies in Germany. A carbide tip is usually 60-70% value of a complete carbide tool. The labor cost in Germany is 5 times the labor cost in China. Also, Carbide tips from China are subject to 35% antidumping duties upon entry into the European Union. See **Exhibit 8**. A German carbide tool will be at least double the cost of a Chinese carbide tool.

Also, a Google map search shows that KKT Germany is only a small building. See **Exhibit 9**. It is not possible to the house manufacturing facilities capable of producing the quantity that KKT USA was purportedly imported from Germany.

Relator purchased trade data from the cargo tracking service "Panjiva" and found that before August 2018 KKT USA was heavily importing from China, but all its Chinese imports stopped in August 2018. According to the Panjiva data, from 2016 to 2018 KKT's Chinese imports were at least twice the volume its German imports (which we believe are also transshipped). It is not realistic to believe it could have suddenly stopped imports from China and substituted the quantity of Chinese goods with German goods.

Therefore, Relator strongly suspected that KKT USA was merely transshipping from Germany and claiming German country of origin.

*2. Relator's Further Investigation in China*

In 2019, Relator visited its Chinese supplier Zhejiang Pacific twice and each time found that the factory was making carbide tips and brazing the carbide tips on steel bodies that were impressed with King Kong logos. See **Exhibit 4**. The factory packed the complete carbide tools into cartons bearing King Kong logos. See **Exhibit 5**. The label of the carton stated, "Highest Quality from Germany" and lists both KKT Germany and KKT USA's phone number - +49-7422-

270099-100 and +1-678-765-7930 respectively. See **Exhibit 6**. Relator also observed that the steel bodies were machined in China, for example, holes were drilled on the steel bodies or surfaces were polished perfectly flat to fit to the machinery they are going to work with. That is to say, the carbide tools made by Zhejiang Pacific for KKT in China were final finished products. No further manufacturing was required for KKT to perform before it sells the products to its customers.

If KKT Germany assembled Chinese carbide tips and steel bodies (of any origin) in Germany, why did Zhejiang Pacific use packaging boxes stating, "Highest Quality from Germany" and listing both KKT Germany and KKT USA's phone number? The complete carbide tools made in Zhejiang Pacific must be destined for U.S. market because the labels list country of origin in English and KKT USA's phone number.

Relator also inquired with Betek GmbH, a competitor of the Relator and KKT, which is in the same city as KKT in Germany. One of its employees stated that KKT is not manufacturing at any German facility, and expressed the concern that KKT was causing sales problems to Betek as well by falsely claiming German origin.

*3. Other Corroborating Evidence*

KKT's manufacturing carbide tools in China, importing them to the U.S., and claiming them to be of German origin was previously revealed in a federal patent infringement lawsuit, styled as *Fecon, Inc. v. King Kong Tools, LLC and Kingkong Tools Gmbh & Co. KG* with case number 1:16-cv-1137. The complaint is attached as **Exhibit 7**. This patent infringement lawsuit is not a "public disclosure" bar to this instant qui tam action because it did not relate to the avoidance of paying Section 301 tariffs or the avoidance of paying regular duties by misclassification.

C. The Facts About Misclassification and Underpayment of Regular Duties

During the investigation of KKT's evasion of Section 301 tariffs, Relator purchased from Panjiva KKT's export data which collect information from cargo manifests. KKT USA imported carbide tools and classified them under HTSUS subheadings of 8479.89.xxxx, 8430.39.xxxx, 8413.91.xxxx, 8430.41.xxxx, 8474.20.xxxx, 8431.43.xxxx, 8431.49.xxxx, 8431.49.9085, 7318.15.20xx, 7315.22.00xx, etc. , according to the Panjiva report. All the above tariff codes KKT USA used provides for 0% duty rate.

Relator believes that KKT USA must have misclassified and misdescribed the vast majority, if not all, of its imported merchandise. For example, KKT USA imported "TOOLS FOR TUNNELING AND LEVELLING MACHINERY WITH CARBIDE" under two different HTSUS codes – 8479.89.xxxx and 8430.39.xxxx. Which one is the correct HTSUS code? Further, subheading 8479.89 provides for COMPLETE "machines and mechanical appliances having individual functions, not specified or included elsewhere in [Chapter 84]." Subheading 8430.30 provides for "Other moving, grading, leveling, scraping, excavating, tamping, compacting, extracting or boring machinery, for earth, minerals or ores; pile-drivers and pile-extractors; snowplows and snowblowers: Coal or rock cutters and tunneling machinery: Other." These provisions are for COMPLETE machinery, not the interchangeable/wearable parts.

For another example, KKT USA imported "GRINDER TIPS - ROTARY DRILLING RIG PARTS" under three different HTS subheadings - 8413.91, 8430.41 and 8774.20. Which is correct? Subheading 8413.91 provides for "Pumps for liquids, whether or not fitted with a measuring device; liquid elevators; part thereof: parts." From the description, the merchandise is not a part of a pump or liquid elevator, but a part of rotary drilling rig. Rotary drilling rig is classified under HTSUS subheading of 8430.49. Rotary drilling rig parts should be classified in subheading 8431.43.4000. For yet another example, KKT USA imported "STEEL PARTS FOR TUNNELING AND LEVELLING" under three different HTSUS subheadings - 8431.43, 8430.39 and 8431.49.9095. Which one is correct?

Moreover, from KKT USA's website and its catalog it is obvious that KKT USA imports not just steel parts or tools for tunneling or leveling machine or rotary drilling rig parts. It imports carbide tipped replacement tools for forestry mulchers, replacement blade for wood chippers, replacement tooth for shredders, replacement tooth for grinders, and so on and so forth. KKT USA has intentionally incorrectly described and misclassified the merchandise it imported.

Relator imports similar items as KKT USA and is paying 0 – 5% regular duties, depending on the type of products. Relator's average duty payment is 2.5% of the entered value.

## IV. ESTIMATED DAMAGES AND PENALTIES

After September 21, 2018, KKT USA stopped all its imports from China. Before that it had about one shipment per month from China in the previous years. Each shipment is estimated to be of $125,000 value. The applicable Section 301 tariff would be $31,250 per shipment. The Relator estimates that the Section 301 tariffs that have been evaded by KKT is $625,000.

Because of KKT USA's misclassification and misdescription of imported merchandise, Relator can only estimate the duty loss caused by KKT USA's misclassification and misdescription schemes by multiplying the estimated total value of shipments in the previous 5 years and 3 months (94 shipments and $125,000 each shipment) by 2.5%. The amount of duty underpayment in the past 6 years is estimated to be more than $293,750. Additionally, marking duty of 10% of the entered value is estimated to exceed $1,175,000.00.

The duties and penalties the Government is entitled to collect under FCA therefore exceed 6 Million US Dollars.